19-1054 Ozburn-Hessey Logistics LLC v. NLRB 19-1090 Ozburn-Hessey Logistics LLC v. the National Labor Relations Board with the United Steel Paper and Forestry Rubber Manufacturing Energy Allied Industrial and Service Workers International Union, Intervenor. Oral argument as follows, 15 minutes for the petitioner cross-respondent, 11 minutes for the respondent cross-petitioner, 4 minutes for the intervenor. Mr. Bodzey for the petitioner cross-respondent. Good morning, Your Honors. May it please the Court, I'm Ben Bodzey here on behalf of Ozburn-Hessey Logistics. I'd like to reserve two minutes for rebuttal, please. Your Honors, I have a lot to get to in a short amount of time, so I want to start by talking about Lauren Keele's discharge. The issue on Lauren Keele's discharge was whether it was caused by a material, substantial, and significant change to OHL Ozburn-Hessey Logistics' timekeeping system. Your Honors, we would submit that the ALJ correctly concluded that there was not a material, substantial, and significant change to the timekeeping system, simply changed from a push-button swipe a card to a touch-screen swipe a card. There's no functional difference between the two. We would further submit, Your Honors, that the Board's own precedent in Rustcraft specifically held that changing the timekeeping system from a manual handwritten system to a punch card system was not a material, substantial, and significant change. So if that does not constitute a material, substantial, and significant change, the Board offers no explanation as to why going from a punch system to a touch screen represents that change. Was there an argument by your friends on the other side that this did impact the time it took to respond to leave requests and that maybe that could take it up to a day? So, Your Honor, that raises an important point, which is for Lauren Keel's discharge, the only issue is how it affected the punching in and punching out, because leave requests had nothing to do with Lauren Keel's discharge. There was also, they raised the point that there's a 50-page instruction manual. Yeah, well that's not what I asked about. I asked about the leave policy, and so I understand that doesn't apply to her, but did it change it? Does it take longer? And if it does take up to a day, is there sort of an emergency process if you have to run to get your kids from school or something? Your Honor, again, the only portion of the change in timekeeping system that applies to Lauren Keel's discharge is the punching in and punching out. So regardless of whether there's... Okay, I got that point. So let me ask you, is there any evidence in the record that large numbers of employees who likewise had to use the new punch in system were adversely affected in that it required them to come back and initiate the process earlier? You know, I know in this one instance that constituted the tipping point of hers, she said that she was punching in and there was some kind of an error and she had to start again, and by the time she got it completed, it made her late. So is there something about this system that required people a lot more time, or is there information that a lot of people had difficulty with this? Not at all, Your Honor. There's nothing in the record about that. And in fact, the record establishes that under the old system, the unit time system, if you made the wrong punch, it would beep and then you'd re-swipe. And then under the new system, if you made the wrong punch, you'd hit home and then you'd re-swipe. But there's no testimony about other people having difficulties or anything to that effect. And to answer the question that you asked, Judge Radler, no, I don't think that the fact that it took one day longer to potentially approve leave requests would rise the level of material substantial and significant. It wouldn't to me, especially if it's a vacation three months from now. I don't know if they're raising some snafu where if you need to leave early that this is some significant change. There was no specific incident that was referenced or even the subject of an unfair labor practice allegation. Yes, I'm not even sure why that's part of the timekeeping system. It simply automated instead of... Automated a bunch of stuff. It did. Correct, Your Honor. And even if you get past the material substantial and significant piece, there's also the question of causation. So Ms. Kiel had accumulated 12 points prior to this incident. She ran up to the clock, and I think the testimony is actually push someone out of the way so that she could try and swipe. She was cutting it... Close. Close, to put it mildly. And so is the clock the problem or is it the cutting close that's the causation? So we would submit that it's the cutting it close. Let me move on to Stacey Williams' discharge. Mr. Williams asked for a union representative in a meeting where he was not entitled to a union representative. He was told twice by HR the reason we're not giving you a union representative is because this is predetermined discipline. We're actually administering the discipline. This is not a situation where we're investigating where you would be entitled to a union representative. He then left the meeting twice and then went out onto the floor of the warehouse and at his desk refused to come back to the conference room. He was discharged for insubordination. Now the theory is that somehow he was engaged in some type of protected activity by reasonably believing that he was entitled to a union representative in that meeting. A couple points there. Number one, if the rule is that the company has the right to administer discipline without a union rep present, then how could you ever effectuate that if the employee can simply refuse to sit in the meeting? There's no way to square those two concepts. The second point is that temporarily he was told why he was not being given a union representative and then he subsequently went out to his desk and refused to come back to the conference room. As Chairman Ring pointed out in his dissent. If he hadn't been mistaken about his right to a union representative, in other words, so he'd gone out to his desk and refused to come back. Would that have been insubordinate? It would have, Your Honor. He doesn't have a right not to attend meetings. He has a right to a union representative and if the company violated that right, he would have other remedies that he could pursue through the NLRB, but he doesn't have a general right not to participate in a meeting. Okay, let me move on since I see my time is short. Let me address together Nanette French and Sean Wade because I think the issue in both of those, the core issue is knowledge. So the board, in both cases, the ALJ who sat through the trial and made credibility determinations, determined that OHL did not have knowledge of union activity. And let's start from the place of you can't retaliate against someone based on something you don't know about. So one of the prima facie elements and the right line elements is knowledge of union activity. Now, in both cases, there's generalized testimony that there was union activity going on in a parking lot and that the individual who was terminated at some point was in that parking lot while the union activity was going on. Not that they themselves were engaged in union activity. And in fact, with regard to Mr. Wade, the testimony is he was standing next to someone who was a known union supporter. Well, standing next to someone who's a known union supporter doesn't mean that the employee themselves is a union supporter. But the board took a logical leap there and said, well, from the timing, we think you can infer from the timing that there was knowledge of union activity. But that reads out of the right line analysis the element of knowledge. There's an element of knowledge in the right line analysis. And if you can just infer it from the timing, you would never have to have actual knowledge of union activity, which is what you have to have in order to retaliate against someone for that activity. So with respect to French, the point of knowledge was that there were two people who were in a parking lot out of, how big is the workforce? At that facility, roughly 40, 50 people. Yes. And they thought, the argument was that you thought it was her or knew it was her of the two. Correct, Your Honor. Of the two of 50. Right. Because someone else had been engaged in union activity in that parking lot. That's the argument, or that's the inference they're attempting to draw. Again, the ALJ who heard the testimony actually concluded that there was no knowledge, both with respect to Wade and with respect to French. And you really don't, unless you establish knowledge, you don't, there can't be a violation. With respect to Wade is the argument that Coleman saw Wade, maybe through the rear view mirror or something. Right. It seems sort of circumspect. And then, but Coleman didn't actually do the termination. It was someone else who did the termination. He didn't, and the unrebutted testimony is that he was not involved in the termination. The unrebutted testimony is he didn't know who Wade was. The only conclusion that the ALJ drew was that Coleman likely, and that's the word he used, likely saw Wade in his rear view mirror standing next to Anita Wells who was a known union supporter. That's the extent of the knowledge, or the evidence of the knowledge. And, as the ALJ pointed out, I think a little bit sarcastically maybe, he said, I don't see how the timing or the inferences that the board is trying to draw make Coleman's vision any more acute. Point being, either he saw him or he didn't see him. And either there's knowledge or there's not knowledge. But this concept that we can just infer from the timing is not correct, Your Honors. On the remedies question, the board, sua sponte, found enhanced remedies in this case. And the issue with the remedies is that there's no standard that's articulated for when these enhanced remedies are warranted, is one issue. The standard that's articulated is when it is warranted. Well, that's not a standard, respectfully. That's any time the board decides that it wants to apply enhanced remedies. It's almost a case-by-case approach. Right. And so it doesn't put the employer on notice of what could lead to those enhanced remedies, is the argument, number one. Number two, they're imposing enhanced remedies in a case where we won nine out of ten discharges at trial. We won before the ALJ. There were dissents by the chairman of the board of the NLRB. These are close calls in these cases. And so to impose enhanced remedies in cases where labor law experts disagree, respectfully, is not comparable to the Pacific Hotel case, where if you read, it's quoted in Chairman F. the judge, I'm not going to comply. That's not the situation here. We've complied with any order that's been against OHL. We've actually had over 300 unfair labor practice allegations that have been filed against OHL since all this started. And a small portion of them have resulted in final orders where we've complied. You said that you have complied, but part of the remedial order really required reinstatement of a number of individuals. Did you get a stay on that, or did you bring those people back in? So actually, Your Honor, the board goes through a separate process called a 10-J injunction process. And so they went to district court and got injunctions, and those people were brought back in. May it please the Court, my name is David Cashionley. I'm representing the National Labor Relations Board. In this case, I'd like to start by addressing Lauren Keele's discharge, but before I get to that, I just want to quickly mention here, we're not dealing with a case that before the board was solely a close case with a few discharges that were hotly contested. There are 16 alleged violations of the act here that are not being contested on appeal and that have been at this point conceded. And that is adding, of course, to every single other violation that the board has found in six previous cases, all of which have been, all of those orders have been enforced in full by the Federal Courts of Appeals in six other cases. So this is, this is not, the board did not give any remedies in this case. This is not a case that the board viewed as, this is all that happened, is what's before the court here. There's a course of conduct going back for years. Well, then what, are we talking about, is this about remedies, this point you're making? My point is that this is, this is something that affected the board's entire view of the case, is that that's the context. Well, one's hearsay might think there were 20 violations that weren't appealed, there were only a handful that were, maybe these are the ones that were the hardest to sort of justify. But, but anyway, the remedy, is there other authority for such a severe remedy other than a specific hotel case? Your Honor, for some of the specific remedies, there are older cases that have notice, post impairments, and Pacific Beach, Pacific Beach was the main authority relied on by the board. Keep in mind the board ordered less here than that was ordered in Pacific Beach. The board didn't order litigation expenses or bargaining expenses or anything along those lines like it did in that case. I mean, would you concede that this is a, this is the most extreme remedy you've ever seen? Pacific Beach or this case? Well, which one's more extreme? Are those the two most, are those the most extreme? Pacific Beach is the most extreme case that I'm aware of. And this case is definitely not at that level in terms of the remedy. Is it, is there anything, is it second? Is it second in your mind? Yeah, this is probably second. But also, there is no other case that Osborne-Hesse points to that they say, you know, should have been second. In other words, there's no other case between this one and Pacific Beach that we can point to and say, okay, there's something that's worse than Osborne-Hesse but not as bad as Pacific Beach. Another way of saying that is there's no other case where such a penalty has been imposed. This exact penalty, no. But again, they took Pacific Beach and lessened the remedies that were applied then. And that seems appropriate for this case. I mean, we're talking about there hasn't been any single facility that the board has found this many unfair labor practices at in the past decade. The board hasn't applied these in other cases because these are really remedies that the board applies, reserves for serious cases. And it found this was an extremely serious case of repeated misconduct. Moving on to Ms. Keele's discharge, I just want to make one point about that, which is that the board's analysis when it comes to Section 885 discharges pursuant to a unilateral change is twofold. It's first, was there a material and substantial change? And then second, was the discharge attributable to that material and substantial change? I'd like to talk about just the second part. I think the court fully understands that the issue with the first part is whether the only dispute there seems to be whether the leave requests count and what that would matter. And I think the court has a good handle on that, but I do want to talk about the discharge. Your colleague said it wasn't a problem, so the leave requests, it's either separate or not. I thought it was in your brief that you made this point. Yes, Your Honor. We make the point that, well, they made two points about the leave requests. One, that it wasn't material and substantial because no employees had any problem with McKeel's discharge. I guess I'll address both briefly. First, in our view and in the board's view, this was a material and substantial change because it substituted an employee personally knowing at the moment when they talk to a supervisor, when they submit their form, with an impersonal machine that would let them know at some point in the future. And that means that if somebody- I thought the evidence was a day. The evidence was about a day, yes, Your Honor. At some point in the future, it's a day. Well, we don't know that that's true in every case. There is no rule saying the employer must go back, but that was generally, at this point, the system had been up for three weeks and that was generally what employees were expecting. These requests for, like, I need to take some time off three months from now? All leave requests. Sick leave, any kind of leave had to be put in through the request. So anything, you know, I need to take time off tomorrow, I need to leave early today, all of those would be going in through the Kronos system, whereas before they would all be submitted by paper handed directly to the supervisor. I mean, if somebody needs to be off that day, you're saying the company didn't- wouldn't tell them, okay, you can go or you can't? Yes, Your Honor. That is- I mean, there was testimony of, I believe, one employee that they submitted a leave request and didn't get a response back and had to come in the next day without getting a response back when they planned to be out the next day. So there is- so that is the situation, yes. And moving on to the connection to Kiel's discharge, the board looks at this in two different ways. The question for the board is not whether her discharge can be attributed to any particular aspect of the change made to Kronos. The question is whether the Kronos change was material and substantial, and if so, was her discharge because of that? And her uncontested testimony is in the record, and she said that, you know, when I clocked in, I swiped my card, I hit the wrong button, I hit the correct button to return, and it gave me a- it froze for a couple seconds while it was loading, which only happens with a touch screen, and then I was two seconds late when I ended up clocking in. That was her discharge. And that pretty clearly attributes it to Kronos, and under the substantial evidence standard- A time clock could malfunction, too. It could just not press or something. But just as a broader rule, I mean, I'm really struggling with this idea that every time a company wants to enhance some aspect of its operations, which in our society now happens all the time that they have to negotiate over every one of those, and this is very common technology. If you go to an ATM machine, use an iPad, I mean, we're always using touch screens all over the place, so it wasn't something that would be expected or that employees wouldn't have familiarity with just in their everyday life, and so the rule you want us to uphold is that any technological change that a company makes has to be bargained over? Your Honor, it's not any technological change. I mean, the board doesn't say that any change- for instance, if the change here had just been to a touch screen without any additional functions like Kronos had, the board doesn't reach whether that would have been material and substantial. So it's not any technological change. And also, keep in mind that this is only in first contract bargaining is this ever an issue. Generally, employers and unions will bargain to an accommodation and have a management rights clause that addresses exactly particularly in changing- in organizations that change technology frequently, that addresses  If she had three weeks earlier before Kronos got there, she skids up to the machine, the time clock, which I assume actually keeps time, and she swipes her card, and she hits the wrong button, a push button, not a touch screen. And in the time that it takes her to push the right button, the time clock clicks from 8.59 to 9 o'clock, or 9 o'clock to 9.01. She's just as late as she is on the touch screen. Why is her problem attributable to the touch screen? Well, Your Honor, she testified that it wasn't that it flipped over right after she swept her card. It's that she pressed the button to return- the home button to return to the home screen, and while that screen was loading was when the time clock flipped over. Whereas with the physical time clocks, you don't have to wait for a screen to load. You swipe. If you hit the wrong button, it beeps. Then you hit the right button immediately. So that's Keele's testimony in the record. So if you're fast enough on the beep, you win, and if you're not, you lose. Yes, Your Honor. And the testimony here is that she would have been- her testimony was if it had been the physical clock. I'm going to move on to the French discharge briefly. I just want to clarify one point with that. I see I'm running close to out of time, and that's for the knowledge here. This is a situation where two employees from a different warehouse that's in the same complex in the same Memphis area warehouse system were in a parking lot that they don't use as employees. We know that at least two- and they were hand-billing for the union. Ms. French was also in there hand-billing with them. She was not somebody who was just briefly talking to them. She was soliciting other employees to sign cards. She was wearing, she testified at the time, union paraphernalia when she was doing it. She had a union button on. We know that at least two supervisors came by and called their manager, Margaret Bonner, to report during that time that there were two union people in the lot that they didn't recognize soliciting cards. We don't know anything about whether- neither of those supervisors testified, and Bonner didn't say she asked them whether they also saw French or anything like that. We don't know that. We also know that French had left when a different person who the judge found not to be a supervisor came and asked the two employees to leave. Under those circumstances, the board reasonably drew the inference that this is somebody using a shared lot, openly engaging in union activity that several supervisors, more than one, observed people doing in that lot at the time she was doing it. What was the stated reason for her discharge? The stated reason was that she was a minute late coming back from lunch, Your Honor. But Kiel wasn't discharged for being late and suspected union activity. Correct, Your Honor. So how could they not discharge French for being late when they discharged Kiel for being late? Well, Your Honor, the question the board looked at is it appears that from all the examples the board had, they didn't apply that standard to every employee who reached their- So they didn't discharge people who were a minute late. They did sometimes in these two cases, but these are the only two cases in the record where they discharged somebody who accrued only 13 points. All of the other situations the board looked at, employees had accrued far more points than that. Seeing as the amount of time- Yes, Your Honor. When did the other 13-point termination happen? Kiel's was three weeks before French's, Your Honor, or sometime around that. I believe it was April 30th or it was sometime in late April, and the others were in mid-May. All right. Thank you. Thank you. Thank you. May it please the Court. Catherine Shaw on behalf of the Intervenor United Steelworkers. I wanted to just briefly address Sean Wade's termination. Mr. Wade was terminated for stealing time when he briefly left the building to move his car. Prior to Wade's discharge, the company had routinely tolerated such actions, and the board recently found that the fact that Osborne Hesse had treated other employees leaving the building for a short time as at most a minor offense but discharged Wade for a first offense indicated that his union activity was a reason for his discharge. The board reasonably relied on testimony from several employees that showed that Osborne Hesse at most assessed an attendance point for such activity. Employees testified that they almost uniformly, before Wade's discharge, regularly left the building without consequence, sometimes in full view of their supervisors. If they were queried about it, did they lie? I'm sorry? If they were queried about it, did they lie? I don't know that there's any evidence that employees lied about leaving the building. I thought there was some question about whether Wade did. I'm unsure about that. Might have been Smith. I think maybe that was Smith. No, you're right. It was Smith. Take it back. Sorry. Don't want to throw you off here. Sorry. And tell me, how much time did Mr. Wade allegedly steal by going out to move his car? The record shows that he was only gone for a few minutes. By contrast, there was an employee, Shakila Banas, who clocked in one minute before her shift started. She left the building and returned eight minutes later. Her supervisor did observe that, and she was assessed an attendance point, but she was not. OHL viewed her actions as akin to arriving late, not as stealing time. And when employees left or took time for bathroom breaks and all that, which they're entitled to, and I'm assuming that the company didn't limit the number of such comfort breaks they could take during the day, did they have to clock in or did they have to make some kind of notation of how much time that took? Because when you talk about the stealing time, that's a pretty serious allegation. I don't believe so. There was not any evidence in the record that described other. It's just when they went out of the building. Yes, yes. And there was evidence that employees would leave to roll up their windows, and that that was effectuated without clocking in or out, and that it was generally tolerated. I see that my time is very short, and I did want to respectfully request that the court take judicial notice of the consolidated complaint issued by Region 15 of the NLRB just last Wednesday, October 9th. This complaint alleges multiple unfair labor practices committed by the company, including threatening employees with unspecified reprisals if they joined or supported the union, and unlawfully discharging one employee and disciplining several other employees because of their support for the union. This complaint is relevant in response to the company's argument that its conduct, since it committed the unfair labor practices at issue in this proceedings, should excuse it from compliance with the board's ordered remedies. I wanted to ask you about the remedy before you stopped here. Are you aware of a case, other than a specific hotel case, where there was any punitive measure like the one that was imposed here? The extraordinary remedial order in this case, my understanding is that it is the most serious, that Osborne Hesse is the most serious case that has come before the board other than the Pacific Beach Hotel, and that the order is therefore the most serious order other than Pacific Beach Hotel. What is the point of this public reading where the managers have to be there and they read these? I understand posting it so people can see it. I don't understand posting it for three years, but I understand posting it. But what is the point of this public, shaming almost, reading of the violation with the managers and their... The board states that it's to ensure that all of the managers and supervisors know their obligations under the act, especially given their repeated violations, including the same violations, including terminations, confiscation of literature from employee break rooms, and their attendance at the public reading is to ensure that they do not continue to make the same, commit the same violations. I would have to think that everyone at the company, just given how frequently you all are here, that everyone at the company knows sort of the history here. I would think that ball is hit from the managers. I would also think so, but as we continue to see, they do not seem to know what their obligations are as they continue to violate the act. The election here, this union was recognized by a one vote majority. Is that correct? Yes. Yes, the vote took place in 2011, and we're still here. All right. Your red light is on. We thank you for your argument. Thank you. Thank you. Your rebuttal. Just picking up on your last question, Judge Donald, this was a situation where there was a contested outcome of the election that was litigated out. Since then, once it was litigated out, we've recognized the union. We're bargaining with the union. There was mention of a consolidated complaint that's been issued by the NLRB. I haven't seen that yet. I'm not surprised. They filed unfair labor practice charges, so I'm aware of that. But allegations shouldn't be taken into account in deciding what the proper remedy is in this case. In terms of Nanette French, it was mentioned that there were two employees from other facilities that had come onto the parking lot at her facility. She worked at that facility, so her being in the parking lot would not be out of the ordinary. But the other employees coming onto that parking lot for organizing purposes would be notable. Her being in that parking lot would not be notable. With respect to- What about Wade? I think Wade is probably the closest call. So on Wade, there were questions about disparate treatment. I don't think you get to disparate treatment until you get to knowledge. Knowledge comes before disparate treatment in the order of analysis because, again, you can't retaliate based on something you don't know about. But when you look at disparate treatment, that's usually to test the validity- Everybody thought he was pretty well known to be a union supporter, sympathizer, pro-union. But your point is they didn't know that he had signed the card? Right, exactly. And so there's no evidence in the record about the other people who left the building and were treated dissimilarly, whether they were union supporters or weren't union supporters, or whether OHL knew they were union supporters or didn't know they were union supporters. There's also no evidence in the record to show that the decision about what to do with them when that happened was made by the same person that made the decision about Sean Wade. And that's another point that ALJ made in his decision. I see my time is up. Thank you, Your Honors. We ask that you grant our petition for review. Thank you. We thank you for your argument. The matter is submitted, and we will give an opinion in due course.